HAROLD B. SCHWARTZ and HELEN SCHWARTZ, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Schwartz v. Commissioner
Docket No. 1110-72.
United States Tax Court
T.C. Memo 1973-226; 1973 Tax Ct. Memo LEXIS 61; 32 T.C.M. (CCH) 1071; T.C.M. (RIA) 73226; October 15, 1973, Filed Herbert L. Zuckerman and Joseph G. Aronson, for the petitioners. Thomas S. Carles and Irwin R. Cohen, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION
DAWSON, Judge: Respondent determined the following Federal income tax deficiencies and additions to tax against petitioners: 2 Year
Deficiency
Addition to Tax Sec. 6653(b) [1]
1963
$2,562.41
$1,281.21
1964
2,170.57
1,085.29
1965
4,535.65
2,267.83
1966
7,591.92
3,795.96
*62 The issues for decision are: (1) Whether the petitioners understated their taxable income and are liable for the deficiencies determined by respondent for the years 1963 through 1966; (2) whether any part of the underpayment of tax for each of the taxable years 1963 through 1966 was due to fraud with intent to evade tax; and (3) whether assessment of any deficiencies determined for the years 1963 through 1966 is barred by the statute of limitations. FINDINGS OF FACT Some facts have been stipulated by the parties and are found accordingly. Harold B. Schwartz and Helen Schwartz (herein called petitioners) are husband and wife whose legal residence was in Jersey City, New Jersey, when they filed their petition in this proceeding. They filed their joint Federal income tax returns for the years 1963 through 1966 with the district director of revenue at Newark, New Jersey. 3 Harold B. Schwartz was licensed to practice medicine in the State of New Jersey in 1937. During the years 1963 through 1966, he was self-employed as a physician specializing in urology. *63 He maintained an eight room office in Union City, New Jersey, and a second office in his home in Jersey City, New Jersey. During the years 1963 through 1966, Helen Schwartz was engaged as a nurse and receptionist by her husband.In this capacity Mrs. Schwartz made appointments for patients, prepared case histories, kept all files, sent out bills and collected receipts for her husband's medical services. She kept a daily logbook in which she recorded patient names, appointment times, daily billings and fees received. Receipts from patients in the years 1963 through 1966 for Dr. Schwartz" medical services were paid either in cash or with checks, but all such receipts for these years were recorded in the daily logbook by Mrs. Schwartz. She also prepared disbursement sheets to indicate checks petitioners drew for expenses associated with Dr. Schwartz" medical practice. Cash expenses were provided to Frank J. Pridmore, petitioners' return preparer, who added them to the bottom of the disbursement sheets. Mrs. Schwartz also prepared listings of their annual donations for Mr. Pridmore's use. Petitioners employed Frank J. Pridmore to prepare their joint Federal income tax returns *64 for the eight taxable years 1959 through 4 1966, paying him either $50 or $60 for each year. Prior to 1959, they employed a certified public accountant to prepare their returns. Though recommended by one of Dr. Schwartz" brothers, Mr. Pridmore was not a certified public accountant. He neither audited nor kept petitioners' business records during the years in issue, although he suggested that Mrs. Schwartz prepare disbursement sheets of expenses for his use. In 1964, petitioners' 1961 and 1962 joint Federal income tax returns were audited by the Internal Revenue Service.As a result of this audit, a 5 percent negligence penalty was imposed against petitioners based on unreported cash receipts in both years. Dr. Schwartz told the examining agent he relied upon his accountant to properly prepare his 1961 and 1962 returns and that any omitted income was due to the accountant's error. However, when Dr. Schwartz later informed Mr. Pridmore of the audit, he said the audit was favorable and added that the examining agent had complimented Dr. Schwartz on petitioners' record keeping system. In addition to receipts for medical services performed by Dr. Schwartz in 1963 through *65 1966, petitioners received taxable income consisting of dividends, interest and partnership earnings. However, not all taxable receipts and dividend income were reported by them on their tax returns for such years. 5 Petitioners' joint Federal income tax returns for 1963 through 1966 were prepared by Mr. Pridmore from information supplied to him by petitioners, including summaries they prepared of their purchases and sales of stock, charitable donations, interest paid on borrowed funds, and assistance fees paid to cooperating physicians and nurses. Petitioners did not supply Mr. Pridmore with the daily logbook of receipts from Dr. Schwartz" practice kept by Mrs. Schwartz. Mr. Pridmore computed petitioners' professional receipts based solely upon deposits to a checking account maintained by petitioners at the Commercial Trust Company of Jersey City, New Jersey (hereinafter called the "Commercial Trust account"). He did this in accordance with instructions supplied by petitioners that all receipts from Dr. Schwartz" medical practice were regularly deposited to this account. Deposits to the Commercial Trust account consisted solely of checks. No cash was ever deposited *66 to this account, though petitioners received frequent cash payments from patients in these years. Occassionally Dr. Schwartz accepted as payment a patient's checks in excess of the amount owed him, and he would refund the excess in cash to the patient. Later he would deposit the full check to his Commercial Trust account. On other occasions, an insurance company sent its check to Dr. Schwartz for a patient's 6 bill after the patient had already paid Dr. Schwartz for his medical services. In such cases, where the insurance company check was intended to reimburse the patient, Dr. Schwartz would deposit the check to the Commercial Trust account after returning the equivalent amount in cash to the patient as reimbursement. Because of these practices of exchanging checks, refunding cash to patients, as well as depositing other non-income items such as loan repayments and dividends, only part of the total deposits to petitioners' Commercial Trust account actually consisted of taxable professional receipts. For 1963 and 1964 Mr. Pridmore computed professional receipts by totaling deposits to the Commercial Trust account, and then subtracting a lump sum "personal items" figure *67 supplied him by Dr. Schwartz to represent non-taxable deposits to that account. For 1965, Dr. Schwartz instructed Mr. Pridmore to subtract from total deposits amounts indicated by notations on individual deposit slips for that year as non-taxable deposits of refunds, exchanges, dividends or loan repayments. For 1966 Mr. Pridmore followed the same procedure as for 1965, except he noticed a possible duplicate refund notation for a single patient. When questioning Dr. Schwartz about this, he was told that the income figure arrived at for 1966 was "too low." Dr. Schwartz then provided Mr. Pridmore with new figures to subtract from total 7 deposits to the Commercial Trust account, in lieu of totals derived from notations on individual deposit slips, representing loan repayments and dividends deposited in 1966. Petitioners' dividend income was computed by Mr. Pridmore each year from Forms 1099 supplied by them. All deductions claimed on petitioners' returns were also derived by Mr. Pridmore from information and summaries of disbursements supplied him by petitioners. Mr. Pridmore kept detailed workpapers for each return he prepared for petitioners, indicating the sources of *68 all information he placed on their returns. Each completed return was received by Mr. Pridmore with Dr. Schwartz before filing, and any questions Mr. Pridmore had were answered to his satisfaction by Dr. Schwartz. At one point during these years, Mr. Pridmore suggested that petitioners keep a "cash receipts" book to accurately reflect their professional receipts. Petitioners did not then nor at any time thereafter inform Mr. Pridmore of the daily logbook they kept for this very purpose and which they stated at the trial was the most accurate record of their professional income in each of the years 1963 through 1966. Though provided each year with all of petitioners' cancelled checks, Mr. Pridmore never analyzed them. Instead, he merely spot checked them for accuracy each year. As a result, he was never 8 aware that petitioners did not draw any checks for cash and living expenses in the years 1963 through 1966. In these same taxable years, various checks received by petitioners in payment for medical services were not deposited to their Commercial Trust account. Instead, some checks were deposited to another of their savings accounts, some to their daughters' savings *69 accounts, while others were assigned to a charity, their brokerage accounts and a country club to which they belonged. Mr. Pridmore was never informed of the existence of any professional receipts not deposited to the Commercial Trust account, and such checks were therefore not reported by him as income on petitioner's returns for the years 1963 through 1966. Respondent determined that petitioners failed to report the following amounts of taxable income: Year
Income Not Reported 1963
$ 6,910.45
1964
6,890.06
1965
14,369.00
1966
20,560.24
Petitioners' unreported income from professional receipts was determined from bank statements, deposit slips, and cancelled checks for the years in issue. Originally, when petitioners' 1965 Federal income tax return was audited, the examing agent was supplied with 9 petitioners' daily logbook as a record of professional receipts in that year. Subsequent to that audit, however, no logbooks were made available to respondent for verification of petitioners' professional income in either 1965 or any other taxable year in issue. Nor were any logbooks for these years introduced by petitioners as evidence in this *70 case. Respondent determined petitioners' unreported income to consist of receipt checks diverted from their Commercial Trust account; an estimated annual cash living expense of $2,600; dividends not listed on returns but recorded on Forms 1099 and brokerage statements; and all refunds, exchanges, or other expenses claimed but not supported by a check disbursement. Petitioners reported no cash receipts during the years in issue, and received dividends in excess of those reported. During an audit of petitioners' 1965 return, the examining agent contacted patients Dr. Schwartz indicated had received refunds from him in 1965. When contacted, none of these patients verified Dr. Schwartz" assertion, but instead denied they ever received such refunds. During the years 1963 through 1966, Dr. Schwartz was half owner of Treehaven Gardens, with a cost basis of $391,000. He actively supervised the apartment complex grounds and collected 10 rents every Wednesday and Saturday. Dr. Schwartz was also half owner of a restaurant and catering establishment known as Barra and Schwartz, though he acted solely as an investor. Income from these two partnerships was reflected on petitioners' *71 income tax returns for 1963 through 1966. Petitioners also had substantial stockholdings in these years, for which they maintained two separate brokerage accounts. During 1963, 1964 and 1965 petitioners received dividends directly from the New England Telephone & Telegraph Company. Other dividends they received from this company were credited to them through a second brokerage margin account. A comparison of amounts received directly with dividends unreported shows that the majority of dividends received directly by petitioners were never reported. On the other hand, dividends from this company received by petitioners through and credited against their margin account were reported in full. During the years 1963 through 1966, petitioners held several life insurance policies on which they collectively paid premiums of over $6,350 and on which they were advanced a loan in 1966 of at least $10,000.For at least one of their life insurance policies, petitioners had by March of 1963 prepaid premiums to the year 1983.Petitioners' continuous activity in prepaying premiums and taking loans was unusual. 11 During the years in issue the petitioners also did business with the *72 Hudson County National Bank. Petitioners' loan balance there was approximately $68,000 until March 1966, when they paid $20,000 against it. Subsequent loan payments were made by petitioners against this balance amounting to $10,000 on December 29, 1966 and $10,000 on December 30, 1966. In November 1965 this same bank loaned petitioners $10,000 on a 60-day note which they timely repaid. Earlier, in 1962, petitioners had applied to the Hudson County National Bank loan department for an increase on their existing collateral loan (secured wholly by stocks) from approximately $68,000 to $100,000, as well as for a second loan of $100,000 secured by petitioners' real estate equity. The stated purpose of their application for these funds was to allow petitioners to construct a $3,500,000 garden apartment complex on property then owned by them and approved for such development. The application was denied by the bank on the grounds that as a national bank it could not take second mortgages. In 1957 Mrs. Schwartz was involved in a very serious automobile injury for which she received a net verdict of $150,000. No evidence was offered by petitioners at the trial concerning the ultimate *73 disposition of this amount in subsequent years, including the years here in issue. 12 The only evidence offered by petitioners at trial to refute respondent's determination of deficiencies in their income taxes for the years 1963, 1964, 1965 and 1966 consisted of statements, unsupported by any documentary evidence, that some deposits to their Commercial Trust account consisted of dividend income and this resulted in double taxation of them each year. Petitioners failed to show whether any dividends were ever deposited in amounts equal to those unreported each year, much less whether dividends in excess of those non-taxable items already subtracted by Mr. Pridmore from reported professional income were so deposited. ULTIMATE FINDINGS 1. Petitioners failed to show any errors in the determinations made by respondent of petitioners' taxable income for each of the years 1963, 1964, 1965 and 1966. 2. For each of the years 1963 through 1966 the underpayment of tax by petitioners was due to fraud with intent to evade tax, and each of their joint Federal income tax returns for such years was a false and fraudulent return filed with intent to evade tax. OPINION Issue 1 *74 - Determinations of Taxable Income Petitioners have the burden of overcoming the presumption of correctness which attaches to the deficiencies determined by the respondent. Welch v. Helvering, 290 U.S. 111 (1933); Ullman v. 13 Commissioner, 264 F.2d 305, 308 (C.A. 2, 1959), affirming 29 T.C. 129 (1957); and Thomas B. Jones, 29 T.C. 601 (1957). In their opening brief petitioners state they have "entered no real defense" to the deficiencies determined by respondent. We agree. They conceded throughout the trial of this case that they failed to report substantial cash receipts Dr. Schwartz received for his medical services in the years 1963 through 1966, as well as substantial dividend income received from New England Telephone & Telegraph Company for the years 1963 through 1965. Petitioners do claim, however, that respondent's computations of unreported income may be in error due to a duplication of income in the years 1963 through 1965. Some deposits, they assert, reported as professional income to petitioners were also reported as dividend income in these same years. But they have failed to support their claim of *75 duplicated dividend income reported in these years with any documentary evidence. A second claim by petitioners is that respondent's estimated figure for their annual cash living expenses for the taxable years in issue was arbitrarily arrived at. Again, they have produced no computations or other documentary evidence to refute respondent's annual cash living expense figure of $2,600 for petitioners and their two college-age daughters in the years 1963 through 1966. Nor have they shown respondent's figure to be arbitrary. 14 In short, the petitioners have not presented any evidence sufficient to overcome the presumption of correctness attaching to respondent's determined deficiencies. Petitioner Helen Schwartz offered no evidence to establish that she is entitled to the benefits of the "innocent spouse" provisions of section 6013(e) of the Code.On the contrary, all evidence indicates she was an active participant in her husband's medical practice, acting as both his nurse and receptionist, keeping all records and handling all financial matters related to the practice during the taxable years in issue. She also assisted Mr. Pridmore by compiling lists of disbursements and *76 donations for his use in preparing petitioners' joint Federal income tax returns. She personally kept the daily logbook which was the most accurate record of the total taxable patient receipts in the years 1963 through 1966. She was able to know what total receipts her husband had received in each taxable year merely by reviewing the logbook she kept, which was a constant reminder to her of the receipts income not reported and petitioners' tax liability thereon. Albert R. McGovern, 42 T.C. 1148 (1964), affirmed by order 66-1 U.S.T.C. P9455 (C.A. 6, 1966). Her consistent involvement with all patient receipts and recordkeeping during these years militates against any possible defense of ignorance on her part of what petitioners' actual taxable income 15 amounted to in each year. Charles F. Bennett, 30 T.C. 114 (1958). Mrs. Schwartz was on notice of the substantial omissions from taxable income of patient receipts on completed returns for the years 1963 through 1966, and she has not shown that she did not benefit from these omissions, nor provided us with any other facts making it inequitable for her to be held liable here.See Raymond H. Adams, 60 T.C. 300 (1973); *77 Jerome J. Sonnenborn, 57 T.C. 373 (1971); and Nathaniel M. Stone, 56 T.C. 213 (1971). Issue 2 - Additions to Tax under Section 6653(b) Respondent has the burden of proving that any part of the underpayment of tax by petitioners for each of the taxable years 1963 through 1966 was due to fraud. Such proof must be by clear and convincing evidence establishing that petitioners intended to evade payment of their taxes in such years. Hicks Co., 56 T.C. 982 (1971), affirmed 470 F.2d 87 (C.A. 1, 1972); Abraham J. Muste, 35 T.C. 913 (1961); W. A. Shaw, 27 T.C. 561 (1956). The imposition of a fraud penalty under section 6653(b) is based on a state of mind which is seldom susceptible of direct proof. Hicks Co., supra; M. Rea Gano, 19 B.T.A. 518 (1930).Thus fraud may be established by either direct or circumstantial evidence. Nathaniel M. Stone, supra; Camien v. Commissioner, 420 F.2d 282 (C.A. 8, 1970), affirming a Memorandum Opinion of this Court. There are several "badges of fraud" indicated by the facts of this case. 16 Of course, petitioners' *78 failure to overcome the presumption of correctness attaching to respondent's determination of tax deficiencies will not support a finding of fraud. However, a consistent pattern of underreporting large amounts of taxable income over a period of years clearly appearing the record may be evidence of fraud when there is no satisfactory explanation for such omissions. Serri v. Commissioner, 354 F.2d 1002 (C.A. 3, 1965), affirming per curiam a Memorandum Opinion of this Court, certiorari denied 384 U.S. 987 (1966); Godeny v. Commissioner, 339 F.2d. 262 (C.A. 3, 1964), affirming per curiam a Memorandum Opinion of this Court, certiorari denied 381 U.S. 903 (1965); Blatchford v. Commissioner, 337 F.2d 1010 (C.A. 3, 1964), affirming per curiam a Memorandum Opinion of this Court; Nathaniel M. Stone, supra; Nathan Bilsky, 31 T.C. 35 (1958); Madeline V. Smith, 32 T.C. 985 (1959). Respondent has determined that the petitioners did not report receipts from Dr. Schwartz" medical practice for each of the years 1963 through 1966, which petitioners have virtually conceded is true. In addition, *79 respondent has determined that the petitioners understated the dividends they received in the years 1963 through 1965. This omission of dividends has been stipulated by petitioners. The evidence shows that the petitioners also underreported cash receipts for the earlier years 1961 and 1962 which was later 17 discovered during an audit of their returns for the years 1963 through 1965. This omission resulted in a negligence penalty being assessed against petitioners. It is plain that petitioners omitted from their reported income for the years 1963 through 1966 substantial receipts received from patients as well as substantial dividends received in the three years 1963, 1964 and 1965. During the years 1963 through 1966 petitioners received taxable income totaling $111,559.15. For these same years petitioners reported taxable income totaling only $59,846.90, thereby understating their taxable income by a total of $51,712.25, or approximately 46 percent of their total taxable income. This evidence of a consistent understatement of professional receipts and dividend income demonstrates a pattern of substantial omissions that could be nothing less than intentional. Furthermore, *80 petitioners consistently underreported income from only these two categories on a regular basis. By contrast, we note that petitioners were reasonably accurate in reporting deductible expenses associated with Dr. Schwartz" medical practice each year. It is also significant that they accurately reported most of their dividend income from 1966 after questioning by Mr. Pridmore. In the three prior years the petitioners had never informed Mr. Pridmore of the total dividends they 18 had received. Tsuneo Otsuki, 53 T.C. 96 (1969). Finally, we note that petitioners accurately reported income they recived from two partnership interests during these years on separate tax returns. In view of the accurately reported expense and other income petitioners received during the taxable years in issue, we think it it inconceivable that their substantial and continuous omissions from each of their Federal income tax returns could have resulted from any cause other than their intent to evade taxes. Mere negligence or oversight might cause omission of a particular item, but that certainly does not appear to be the case here. Petitioners claim they are not responsible for *81 the omission of income on their 1963, 1964, 1965 and 1966 income tax returns. They assert that any omission was the error of Mr. Pridmore, the person they employed to prepare their returns. They contend that they provided Mr. Pridmore with sufficient records to prepare adequate returns, but that he was an inept and incompetent accountant who repeatedly failed to increase gross receipts by apparent cash expenditures and who never questioned them about the lack of cash deposits to their business account or the source of their cash living and business expenses. In our judgment Mr. Pridmore's alleged ineptness and incompetence has not been established by the evidence in this record. Petitioners employed him to prepare their returns for eight consecutive years from 19 1959 through 1966. Mr. Pridmore testified that petitioners supplied him with all information he reported on their tax returns. It is obvious such returns could not be prepared by their accountant without their total cooperation. Correct figures for deductions and income could be derived only from information supplied to him by the petitioners. We have carefully examined the workpapers Mr. Pridmore used to *82 prepare petitioners' tax returns and find them to be orderly and extensive. Each figure is verified in his writing as being derived from sources supplied to him by petitioners, or from oral statements made to him by petitioners. Any questions he had were raised with Dr. and Mrs. Schwartz and answered before the return was completed for their signatures. It is clear that Mr. Pridmore never received the daily logbook record of receipts from Dr. Schwartz" medical practice each year, nor was he supplied with certain Forms 1099 revealing receipts from insurance companies and dividends received in each year. To the extent petitioners' testimony conflicts with this finding, we regard their testimony as lacking in credibility and not supported by the evidence of record. It is our view that the petitioners, and not Mr. Pridmore, made the controlling determinations as to what income was to be reported and what deductions were to be taken each year. Mr. Pridmore was merely a conduit for the information petitioners wanted 20 to report each year. Biggs v. Commissioner 440 F.2d 1 (C.A. 6, 1971), affirming a Memorandum Opinion of this Court. Petitioners had direct daily *83 control over all financial and business transactions they engaged in, including a medical practice, two partnerships, extensive dealings with their brokerage accounts, banks, and insurance companies. Wardy v. Commissioner, 396 F.2d 792 (C.A. 5, 1968), affirming per curiam a Memorandum Opinion of this Court. They personally conferred with Dr. Schwartz" patients regarding the amount of fees, the manner of their payment, as well as engaging in the collection, recording and depositing of such fees in each year. Mr. Pridmore, on the other hand, merely compiled totals from figures and data supplied to him by petitioners. We think his workpapers attest to the conscientious and orderly manner in which he prepared petitioners tax returns. In computing petitioners' professional income for 1963 and 1964, Mr. Pridmore totaled deposits to the Commercial Trust account and then subtracted a lump sum figure for "personal items" supplied by petitioners. Again, in computing professional income for 1965, Mr. Pridmore totaled deposits and the subtracted amounts for non-taxable items deposited pursuant to petitioners' instructions. And for 1966, Mr. Pridmore again reduced total deposits *84 by a lump sum which petitioners informed him represented non-taxable items such as 21 repayments of loans and dividends. Not only was Mr. Pridmore specifically directed as to how he could compute petitioners' taxable income from deposited medical receipts, but it also appears that if he had been provided their logbook of such receipts, petitioners would not have been able to claim that certain deposited receipts were actually non-taxable items. If Mr. Pridmore had been provided with the logbook of all receipts, we believe he would never have resorted to use of the bank deposits method in computing petitioners' professional income. On at least one occasion he encouraged petitioners to keep a cash receipts book; yet he was never informed of the existence of the logbook kept for just such a purpose. After concealing the most accurate record of medical receipts from their accountant for eight consecutive years, we reject petitioner's claim that any omission of such income was due to Mr. Pridmore's ineptness or incompetence. As we see it, the contrary is true - the petitioners deliberately concealed records of correct income from their accountant and such concealment is a badge *85 of their fraud. Petitioners claim that Mr. Pridmore could have deduced their cash receipt income by utlizing certain basic accounting procedures each year, such as analyzing their receipts and disbursements, reconciling bank statements, and questioning them about sources of 22 all deposits and cash living expenses. In this connection, we observe that Mr. Pridmore was not employed by petitioners to audit the business records of Dr. Schwartz" medical practice. As a return preparer he was simply a conduit for information supplied by petitioners and placed on their tax returns. And most important, there was never any necessity for Mr. Pridmore to "deduce" cash receipts when petitioners had the most accurate record of these receipts in their possession, the daily logbook. If he had been supplied the daily logbook, Mr. Pridmore would undoubtedly have reported petitioners' correct income from medical receipts each year. A portion of petitioner's unreported professional income consisted of checks diverted by them to other savings accounts or assigned to various third parties. Since these check receipts were never deposited to their Commercial Trust account, Mr. Pridmore never *86 picked them up as additional taxable income. In fact, Mr. Pridmore was never informed by petitioners that such checks were either received or diverted. Once again, the omission of professional income from the tax returns was not due to any alleged ineptness or incompetence of Mr. Pridmore. Rather, petitioners intentionally concealed such additional receipt income by diverting it to other uses and by not informing Mr. Pridmore of either its existence or its diversion. 23 Petitioners also concealed from Mr. Pridmore the result of an audit of their 1961 and 1962 returns wherein a negligence penalty was assessed due to lack of reporting of cash receipts for each of those years. After the audit, Dr. Schwartz misinformed Mr. Pridmore that the audit had been favorable and that the examining agent had complimented petitioner on his record keeping system. Thereafter, Mr. Pridmore merely continued preparing petitioners' returns as he had done for 1961 and 1962.Petitioners obviously were not deterred by a negligence penalty from continuing their efforts to conceal taxable income from both their return preparer and the respondent. Thus we view such actions and statements as indicia *87 of fraud. Petitioners have stipulated they failed to report substantial dividend income during three of the taxable years in issue. They claim this omission was also due to an error by their accountant, Mr. Pridmore, since they supplied him with all Forms 1099 to indicate such income was received each year. Mr. Pridmore, on the other hand, testified that if he had been provided such additional Forms 1099 reflecting dividend income, he would have reported such income on petitioners' tax returns. We believe Mr. Pridmore. His testimony is supported by the record. For a fee of $50 or $60 per year, Mr. Pridmore prepared petitioners' tax return. He never kept their records nor audited their accounts. He had no reason to omit any 24 item of income from their tax return each year. He was neither a friend nor a continuous business acquaintance of petitioners; he merely performed the annual job of preparing their return based on information they supplied him. In our opinion any income reflected by a Form 1099 given him by petitioners was placed on their return for the relevant year. We disagree with petitioners that Mr. Pridmore omitted dividend income even though he was supplied *88 a Form 1099 indicating such additional income was received.Based on Mr. Pridmore's oral testimony, his detailed and annotated workpapers, and the partial inclusion of dividend income by him on petitioners' returns, we conclude that the omission of any dividend income was the result of petitioners' intentional concealment from Mr. Pridmore of such additional income. In reaching this conclusion we note that the amount of dividend income unreported for 1963, 1964 and 1965 almost exactly equals the total dividends petitioners received directly from New England Telephone & Telegraph Company, as opposed to those dividends credited to their brokerage account. The direct receipt of dividend income apparently allowed petitioners to effectively conceal such income from their return preparer for the years 1963, 1964 and 1965. Such concealment of income is another badge of fraud. 25 Accordingly, we hold under these circumstances that the respondent has established by clear and convincing evidence that the petitioners filed false and fraudulent income tax returns for the years 1963 through 1966. We also hold that Helen Schwartz is not entitled to relief under the "innocent spouse" *89 provision of section 6653(b) because of her active role in the business affairs of her husband's medical practice. Issue 3 - Statute of Limitations Since we have determined that part of the underpayment of tax by petitioners in each of the years 1963 through 1966 was due to fraud with intent to evade tax, it follows that the assessment of deficiencies for such years is not barred by the statute of limitations. See section 6501(c) (1) of the Code. Decision will be entered for the respondent. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. ↩